# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL ACTION NO. |
| v. | : | 1:90-CR-0190-5-JOF |
| | : | |
| | : | CIVIL ACTION NO. |
| DIANNE DEMAR, | : | 1:01-CV-3330-JOF |
| | : | |
| Defendant. | : | |

## OPINION AND ORDER

This matter is before the court on Petitioner's motion to vacate or modify sentence pursuant to 28 U.S.C. § 2255 [492] and Respondent's unopposed motion for leave to file a corrected response to Petitioner's motion to vacate [503].[1]

I.      **Statement of the Case**

A.      **Procedural History**

In 1991 Petitioner, Dianne Demar, was convicted after a jury trial of five drug trafficking offenses (one conspiracy count, and two counts each of manufacture of, and possession with intent to distribute, methamphetamine) and one firearm offense. This court determined her drug quantity offense level to be 42 after concluding, based on the testimony

_____

[1] For good cause shown, the court GRANTS Respondent's unopposed motion for leave to file a corrected response to Petitioner's motion to vacate.

AO 72A
(Rev.8/82)

of cooperating witness Charlie Blanchard, that the manufacturing output of the conspiracy had been approximately 93 pounds of methamphetamine.   Petitioner received sentencing enhancements for her leadership role in the conspiracy and for obstruction of justice, producing a final offense level of 47 and a mandatory life sentence on the drug trafficking charges, as well as a consecutive five-year sentence on the firearm conviction.   Petitioner filed a direct appeal from her convictions and sentences, challenging, inter alia, the sufficiency of the evidence on three of her drug trafficking convictions.   On March 11, 1993, the Eleventh Circuit Court of Appeals affirmed her convictions and sentences without opinion.

In 1994, Petitioner filed her first 28 U.S.C. § 2255 motion, pro se, wherein she raised numerous issues of ineffective assistance of counsel relating to the determination of the type and quantity of methamphetamine for which she had been held responsible.   Eventually, two evidentiary hearings were held before Magistrate Judge Joel M. Feldman, the first on September 5, 1995, and the second on November 15, 1995 (with a later continuation not relevant here).   Petitioner was represented by counsel at the second hearing only.

On March 27, 1997, this court denied Petitioner's § 2255 motion [385].   In its order, the court addressed the three issues of drug type and quantity affecting Petitioner's sentence: (1) whether the conspiracy manufactured D-methamphetamine or L-methamphetamine; (2) the conversion ratio to methamphetamine of the two precursor oils used in the conspiracy; and (3) the purity of the methamphetamine produced by the conspirators.   The court first noted that Magistrate Judge Feldman had concluded, based on the evidence presented at the

2

November 15, 1995 hearing, that the type of methamphetamine involved in the conspiracy was DL-methamphetamine.   (During the time frame of Petitioner's conspiracy, the sentencing level for D-methamphetamine was much greater than the sentencing level for a comparable amount of L-methamphetamine, and Petitioner argued that she should have been sentenced for L-methamphetamine because the government had failed to prove at trial or at her sentencing that the drug for which she was responsible was anything other than L-methamphetamine, a failure that the Magistrate Judge acknowledged at the hearing.   However, the government chemist testified at the November 15, 1995 hearing that the drug sample that he tested prior to Petitioner's trial was DL-methamphetamine and, given the precursor materials and conversion formulas that the conspirators had used, they could have produced only DL-methamphetamine.   Accordingly, if DL-methamphetamine warranted the same sentencing treatment in 1991 as D-methamphetamine, Petitioner was properly sentenced for D-methamphetamine).   The court also noted that in the order denying Petitioner's original § 2255 motion, the court had reached the same conclusion regarding drug type in the related matter of Eddie Demar, Petitioner's husband.  Demar had been charged in the same indictment as Petitioner but had pleaded guilty; apparently he had been sentenced at the same December 13, 1991 hearing as Petitioner.

The court next rejected Petitioner's challenge to the alleged 1:3 conversion ratio (in which one gallon of precursor oil was assumed to convert to three pounds of methamphetamine) that the court used to calculate that 93 pounds of methamphetamine

3

product was attributable to Petitioner. The court stated that it had used instead a 1:3 conversion ratio based on the weights of the two substances (in which eight pounds of precursor oil, the approximate weight of one gallon of oil, was assumed to convert to three pounds of methamphetamine). The court noted that using this ratio yielded a smaller methamphetamine output than the 1:1 conversion ratio that Petitioner had suggested. Finally, the court addressed the purity issue by stating that at sentencing it had "focused on the amount of 'pure methamphetamine' that could have been produced from the materials on hand."

On May 8, 1997, Petitioner appealed the denial of her § 2255 motion. On May 9, 1997, this court resentenced Petitioner based on a retroactive amendment to the sentencing guidelines that capped her drug table sentencing level at 38. As noted above, however, Petitioner's guideline calculation still resulted in a life sentence. The court advised Petitioner's resentencing counsel that he was required to state his objections to the sentence or waive them, although the court also stated that it would "preserve for you the issues that you have preserved for appeal in the § 2255."

Petitioner filed a pro se direct appeal from the resentencing; in an order dated May 7, 1998, the Eleventh Circuit allowed her voluntarily to dismiss that appeal. As a result of the 1997 resentencing, the Eleventh Circuit eventually ruled that Petitioner's appeal from denial of her original § 2255 motion was moot. That court instructed Petitioner that she must file a new § 2255 motion if she wished to attack the new judgment resulting from the resentencing. The court opined that the new § 2255 motion should not be considered second

4

or successive.  In so doing, the Court of Appeals did not address the timeliness problem inasmuch as the one-year deadline for Petitioner to file a new § 2255 motion had already passed by the time the court issued its December 21, 2000 order dismissing Petitioner's § 2255 appeal.  However, under the doctrine of equitable tolling, this obstacle does not appear to be insurmountable to Petitioner's further pursuit of her claims.

On December 3, 2001, within one year of the Eleventh Circuit's dismissal of Petitioner's first § 2255 appeal, Petitioner filed the § 2255 motion now under consideration by this court.  The court held an evidentiary hearing on that motion on September 21, 2005.

**B.     Contentions**

In her motion Petitioner claims that under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the jury was required to determine the drug quantity beyond a reasonable doubt. Because the jury made no such determination, Petitioner contends that she should not have been sentenced under 21 U.S.C. § 841 (b)(1)(A) or (b)(1)(B).  Petitioner alleges her counsel at sentencing was ineffective by failing adequately to discredit Mr. Blanchard, a co-conspirator and a key government witness.  Petitioner also contends that her counsel at sentencing and appeal was ineffective in failing to challenge the type or the amount of methamphetamine attributed to her by the prosecution.  In response, the government contends that Petitioner has failed to show either that her counsel's representation of her was ineffective or that her counsel's actions prejudiced her case.

5

II.     **Discussion**[2]

   A.     **Ineffective Assistance of Counsel**

In order to prevail in a claim for ineffective assistance of trial counsel, a petitioner must demonstrate that counsel's conduct so undermined the proper functioning of the adversarial system that the system cannot be trusted to have produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).    A petitioner seeking to meet the *Strickland* standards must show:    (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense.    *Id.* at 687.    As to the first prong, defense counsel will not be considered deficient unless his performance fell below an objective standard of reasonableness.    *Id.*   Counsel is presumed to have provided adequate service to his client.    *Id.* at 690.   Overcoming this presumption requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*   Only cases "few and far between" will prevail on these grounds. *See Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc).    To demonstrate prejudice, a petitioner must show that but for the deficient performance of counsel, the outcome of the trial would have been different.    *Id.* at 694.   These standards apply to the sentencing phase of

_____

[2] In her brief Petitioner contended that her sentence violates *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because the amount of drugs was neither charged in the indictment nor proven to a jury beyond a reasonable doubt.   As Petitioner herself noted in her post-hearing brief, the *Apprendi* line of cases is not to be applied retroactively to defendants whose sentences were final as of the date of the *Apprendi* decision.   *Varela v. U.S.*, 400 F.3d 864, 868 (11th Cir. 2005) (citing *Schriro v. Summerlin*, 542 U.S. 348 (2004)).

6

a trial.  *See King v. Strickland*, 748 F.2d 1462, 1463 (11th Cir. 1984).  This court may dispose of a petitioner's ineffective assistance claim under either *Strickland* factor.  *Oats v. Singletary*, 141 F.3d 1018, 1025 (11th Cir. 1998).

## 1.   Discrediting Charlie Blanchard

Petitioner contends that sentencing counsel was ineffective in his representation because he failed to challenge Charlie Blanchard's testimony with regard to three issues.  First, counsel allegedly did not address aggressively enough a taped conversation between Mr. Blanchard and Petitioner made prior to Petitioner's arrest wherein Blanchard had stated "There was no 25 pounds, there's never been 25 pounds, you know, six or eight gallons of oil or whatever."  Pet. Post-Hearing Brief at 8.  Second, Petitioner claims that counsel was ineffective for failing to "adequately investigate an allegation that Blanchard was willing to alter his testimony for money."  *Id.*  Third, Petitioner avers that "counsel failed to follow up on Blanchard's statements that not all of the P2P oil was converted into methamphetamine." *Id.*

With regard to the taped conversation between Mr. Blanchard and Petitioner, the court finds that Petitioner's sentencing counsel was not ineffective.  Petitioner's counsel specifically objected to the presentence report recommendation of 93 pounds and pointed out that "during the clandestine tape recording between her [petitioner] and Blanchard, Blanchard states, "there has never been 25 pounds."  [PSR, ¶ 68].  Moreover, at sentencing this same tape was referred to by Mr. Demar's lawyer, Mr. Harvey, who was speaking to the relevant conduct

7

for all of the defendants at sentencing.   Because both Petitioner's counsel and another counsel specifically referred to the taped conversation, this court cannot conclude that Petitioner's counsel was ineffective for not referring to it more vigorously.   Moreover, Petitioner has not stated how any  additional reference to this conversation would have changed the outcome of this case.

Second, as to the claim that Mr. Blanchard had offered to change his testimony for money, Petitioner has presented no evidence of this alleged offer.   At the evidentiary hearing Petitioner did not call to the stand either Petitioner or Aubrey Bycus (the alleged two recipients of the offer).   Nor did Petitioner even ask Petitioner's sentencing and appellate counsel about his knowledge of the alleged offer.   Given the lack of any evidence concerning this alleged offer, the court cannot conclude that counsel was ineffective by not using it to challenge Mr. Blanchard's testimony.

Finally, the court finds unpersuasive the argument that counsel was ineffective due to his failure to follow up on statements that not all of the P2P oil was converted to methamphetamine.   In methamphetamine cases courts can use precursor materials to determine drug quantities.  *See United States v. Smith*, 240 F.3d 927, 931 (11th Cir. 2001). Therefore, the court does not see how failure to argue that not all of the P2P had been converted to methamphetamine makes counsel's representation ineffective.

**2.        Drug Quantity - failure to call an independent chemist**

8

Next, Petitioner argues that sentencing counsel was ineffective by failing to call an independent expert to challenge the calculations of drug quantity produced by Mr. Blanchard. At Petitioner's original sentencing, the Court determined relevant conduct based solely on the amount of P2P Mr. Blanchard said he had made from Phenyl Acetic Acid ("PAA"), which was then converted into methamphetamine.  Based upon Mr. Blanchard's testimony, the court used a 37% yield at the first sentencing.

"According to Eddie Demar, in the year prior to his arrest, 20 pounds of pure methamphetamine was manufactured by him with 10 to 12 pounds having been made in Georgia." PSR, ¶ 67.  Further, the presentence report states, "Blanchard's statements and notes indicate a total of 96 pounds of pure methamphetamine was manufactured from the 6 to 8 gallons of oil in the Iverness lab, 16 gallons of oil in the Hernando Lab and 9 to 10 gallons of oil in the Tallapoosa lab."  *Id.*  Petitioner contends that sentencing counsel's failure to retain and call an independent expert to challenge the calculation of 96 pounds of pure methamphetamine rendered his representation ineffective.   At the evidentiary hearing before this court, Petitioner called Dr. Woodford, an independent expert, who testified that the yields would have been lower than those assumed by the court at sentencing.

Because it appears that Blanchard had no prior experience in making methamphetamine, the court will assume for purposes of this order that the failure of Petitioner's counsel to call an expert witness rendered his representation ineffective.   The court makes this assumption without actually deciding that such conduct was deficient.

9

Dr. Woodford testified that there are basically three steps to the methamphetamine process. First, Phenyl Acetic Acid is converted to P2P. In the second step, the P2P is converted to methamphetamine base. In the final step, the methamphetamine base is converted to crystal methamphetamine (methamphetamine hydrochloride). [Tr. 3/29/05 at 45-46].

According to Dr. Woodford, the proper conversion ratio from PAA to P2P is 30%. [Tran. 3/29/05 at 52]. Therefore, according to Dr. Woodford, one kilogram of pure PAA will produce 300 grams of pure P2P. The next step, from P2P to methamphetamine base, by Dr. Woodford's analysis, will have a 50% yield. [Tran. 9/26/05 at 22, 23]. Therefore, 300 grams of pure P2P will produce 150 grams of pure methamphetamine base. The final step, from methamphetamine base to crystal methamphetamine, in Dr. Woodford's opinion, will have a 50% yield also. *Id.* at 30. Therefore, 150 grams of pure methamphetamine base will produce 75 grams of crystal methamphetamine.

Even assuming, *arguendo*, that Blanchard's reference to "oil" means PAA (not P2P or methamphetamine base) and that an independent chemist at trial would have applied the same calculations as Dr. Woodford's, the court finds that Petitioner still would have received a life sentence.[3] Thirty-one gallons of PAA weighs approximately 248 pounds (one gallon is

---

[3] Petitioner and the government argue about what the term "oil" refers. Petitioner contends that it might refer to PAA. The government contends that it probably refers to methamphetamine base or at least to P2P. In its brief the government points out that PAA is a powder and thus cannot be the "oil" referenced in the seizures. While what the substance

10

AO 72A
(Rev.8/82)

approximately eight pounds).   By converting the PAA to P2P, the conspiracy would be left 74.4 pounds of pure P2P (30% of 248).   The conversion process to methamphetamine base would have left the conspiracy with 37.2 pounds of pure methamphetamine base (50% of 74.4).   The final step of converting the methamphetamine to crystal methamphetamine would have produced 18.6 pounds of pure crystal methamphetamine, or 8.45 kilograms of pure methamphetamine.[4]

At trial Petitioner was sentenced pursuant to the guidelines then in effect.   This court determined her drug quantity offense level to be 42 after concluding, based on the testimony of cooperating witness Blanchard, that the manufacturing output of the conspiracy had been approximately 93 pounds of methamphetamine.   Petitioner received sentencing enhancements of two points for her leadership role and two points for obstruction of justice, producing a final offense level of 47 and a mandatory life sentence on the drug trafficking charges, as well as a consecutive five-year sentence on the firearm charge.   In 1997, this court resentenced Petitioner based on a retroactive amendment to the sentencing guidelines capping her drug

---

"oil" refers to will change drastically the output of final crystal methamphetamine of the conspiracy, the court finds that for purposes of this motion it does not matter if oil refers to methamphetamine base or to PAA; either would still result in a base offense level of 38.   U.S. SENTENCING GUIDELINES MANUAL § 2D1.1(c) (1995).

[4] If the oil refers to P2P, the final output would be 28.18 kilograms of pure crystal methamphetamine. If the oil refers to methamphetamine base, the final output would be 56.36 kilograms of pure crystal methamphetamine.

11

table sentencing level at 38.   Adding the sentencing enhancements, her final offense level was 43, which still carried a life sentence.

Here, the court cannot label counsel's failure to submit testimony of   an independent chemist as ineffective assistance of counsel because even if an independent chemist had been called to testify and even if he had applied the same analysis as Dr. Woodford now utilizes, the outcome would not have changed.   Even 8.45 kilograms of pure methamphetamine equates to a 38 base level.[5]   When the court adds the sentencing enhancements, Petitioner's final offense level would have been 43, a level that carried a life sentence.   Therefore, Petitioner suffered no prejudice by her sentencing and appellate counsel's failure to call an independent chemist.

   **3.**   **Type of methamphetamine**

Petitioner, in the instant action, also claims that her counsel's representation was ineffective for failing to address the type of methamphetamine.   This issue was raised in connection with Petitioner's first § 2255 motion.   Ruling on that motion, the court reached the conclusion that the failure did not constitute prejudice to Petitioner because at her evidentiary hearings before Magistrate Judge Feldman, subsequently adopted by this court, the court had concluded that the type of methamphetamine was DL-methamphetamine which

---

[5] Plaintiff would be sentenced at a drug offense level of 38 for "30kg or more of Methamphetamine, or 3kg or more of Methamphetamine (actual) or 3 KG or more of "Ice." USSG § 2D1.1(c) (1995).  Here, the calculations are of Methamphetamine (actual).

12

carried the same penalties as D-methamphetamine.  Further, the same issue was raised and the court reached the same result in connection with the § 2255 motion to vacate filed by Eddie Demar, a co-conspirator of Petitioner.  See Order of December 18, 1995 [344], affirmed by the Eleventh Circuit [387].

Unlike Petitioner's arguments concerning the quantity of methamphetamine produced by the conspiracy, Petitioner has not provided any new information or testimony regarding the type of methamphetamine produced.  Therefore, the court finds no reason to change its earlier rulings concerning the type of drugs produced by the conspiracy.  And, as stated in the court's previous rulings, there is no indication that the sentencing counsel's failure to address the type of methamphetamine prejudiced Petitioner.

## III.    Conclusion

The court DENIES Petitioner's motion to vacate or modify sentence pursuant to 28 U.S.C. § 2255 [492], and GRANTS Respondent's unopposed motion for leave to file a corrected response to Petitioner's motion to vacate [503].


**IT IS SO ORDERED** this 17th day of March 2006.


_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE


13